Mr. Greenberg. Good morning, your honors. May it please the court. The opinion commits a series of legal errors. Most notable are its any shortage conclusion and its attempts to make up for the discrepancies between the numbers on one hand and the reports by Tchaikovsky and Rodolfi on the other by relying on information outside the affidavit. That is a legal error under this court's decision in lull, under the U.S. Supreme Court's decision in Gates and other precedents cited in our papers. In a healthcare fraud case, the alleged loss is as critical as an informant or the type of substance involved in a drug case. It's not an element, your honor, but it drives the prosecution. It drives the investigation. And in this case, especially, where both Tchaikovsky and Rodolfi were reporting alleged pervasive fraud at a pharmacy that had billed over $30 million, if what they said was even remotely close to true, the loss would have been many millions of dollars. Let me show you why. In the affidavit, this is what Leighton swore to. In paragraph 12, this is at JA 2938. Leighton wrote and Mosley agreed that just for target locations number two and three, which is Plum Tree and Care America, more than $30 million was paid to those two locations as of June, mid-June 2013. Then the next paragraph, paragraph 12, that was just paragraph 11 I read from in JA 2938. The next paragraph, she says in relevant part, that the Medicaid program and other payers were, quote, charged for the majority of these automatic refills that the beneficiaries never received. The majority. If that were true, there necessarily would be many, many millions of dollars of fraud. It's wrong, Your Honor, because under law, the reliability of informants is material and the reliability is also not an element of the offense. Here, the numbers and the irreconcilable inconsistency between the reports by Tchaikovsky and Rodolphe mostly understood Tchaikovsky's report to mean PharmaCare was stealing from Maryland Medicaid at a rate of 90%. Rodolphe reported pervasive fraud involving automatic refills for Med Fours. Rodolphe, Leighton put this in the affidavit. Rodolphe told Leighton that Jigar Patel said an automatic refill means you bill it but you don't fill it. And the whole business model is based on auto refills. So if that's true, and Leighton put in the affidavit, the majority of the automatic refills never received were billed for and not reversed. So if that's true, Tchaikovsky and Rodolphe's stories are completely false, can't be reconciled, and that's why it's material, Your Honor. Not exactly, Your Honor. I mean, it's not merely a credibility issue. It is a legal issue. And it is a legal issue. Materiality is a question of law. In law, this court decided materiality, you know, on review of a district court, and it looked at the facts, but not in... So what is it that was material that the district court held was immaterial? I really am trying to understand where we are in the argument. Sure. Well, two main things. One is there are two core elements of the alleged fraud scheme that we discussed. One is this notion that there was pervasive automatic refills that were unwanted and weren't received and Farmacare billed for them anyway. If that were true, there would be many, many million dollars in fraud. And the law's calculation, even if not corrected, but especially after it being corrected, comes nowhere near that, showing that Tchaikovsky and Rodolphe were making it up, or at least were providing unreliable information. The second point is that both Tchaikovsky and Rodolphe said that, quote, Middle Eastern employees used, quote, secret documents to track the automatic refills from Medfors. Lading knew from reviewing the emails that she testified that, in fact, the Medfors trackers were regularly, she said it was a regular thing, they were sent to non-Middle Eastern, Caucasian, other employees. And so those two core aspects of the material to their reliability, as in lull, it is legally indistinguishable from the informant and what happened with the informant in lull. And I want to talk a little bit about, a little bit more about some of these points. The point about going outside the affidavit. The opinion does this repeatedly, the government does it repeatedly. Lull holds, and this court's prior opinion in Owens X. Rowell Owens holds, and lull relies on it, you can't look outside the affidavit to support probable cause. The district judge below, ironically, was the judge in the district court who was affirmed in Owens X. Rowell Owens, and in the opinion, the district judge correctly recognized that you can't look outside the affidavit to support probable cause. But nevertheless, the opinion does that on other pages repeatedly. Most notably, it emphasizes a man named Craig Blomquist. He's never mentioned in the affidavit. He's never referenced in the affidavit. And there's all kinds of other examples. Those are legal errors. Legal errors that violate this court's precedence. And the government repeats it. Now, Care America is one of the other areas that has serious errors. Special Agent Lading testified. Special Agent Lading and Mosley knew by at least May 2013 that to obtain probable cause to search Care America, they needed to identify one or two Care America customers who were former plum tree, and for whom PharmaCare, I'm sorry, for whom Care America was engaging in billing fraud involving Med 4 drugs. That's JA2809. They didn't interview a single patient. They didn't interview anybody related to Care America. And they knew they had to do that to have probable cause to search Care America. They knew. It's undisputed they knew. And they didn't do it. Had they done so, what would they have found to make it clear that it was inappropriate prosecution? Had they done so? Yeah. They would have found That was clear. That was clear. Because that's what your point is, that the failure to investigate would have led to clear evidence that this would be fraudulent and no reasonable officer would, is that your position? So tell me what would they have found that's so clear? Well, Your Honor, two points. One, they would have found that patients were in fact getting their prescriptions from Care America. That the HIV, hepatitis C and cancer patients were in fact getting their prescriptions. And doctors and other prescribers were writing the prescriptions and refills, automatic refills as allowed under the applicable law in relevant jurisdictions. Moreover, had they, it's not really what they would have done. It's the fact that the affidavit misrepresents Care America as having fraud when there's nothing in there to support it. I thought you said on Care America, I may be misremembering, but didn't the district court say it's like actually the same facility, it had a new name, but all the prescriptions transferred over? Yes, Judge Harris, that's, the district court said that, but, so the old Emerton location closed in January 2012. Lading testified unambiguously that under Maryland Board of Pharmacy Regulations, everything from old Emerton was removed within days. Yeah, but that's not what the district court found, and so I guess, I mean, I think what is difficult about this case and your argument for me is, you know, the court had a really long trial and looked at a ton of documents and then made these 70 page opinion with all these detailed credibility findings and factual findings, and so, I mean, you see it today and you're right and the district court is wrong. Well, Your Honor, it's not, we're not saying, it's not just looking at the evidence and saying we're right and the district court is wrong. We're saying the district court committed a series of legal errors, most notably the ones I mentioned. Yeah, I'm talking about the Care America. About Care America? Well, that's a legal error as well to, when you've got substantial evidence ignored by the district court, that, you know, under this court's precedence, under U.S. Supreme Court precedent, when a district judge ignores substantial evidence, they can't then insulate their decision from review by using the word credibility. That's pretty clear in the precedence. And, I mean, a good example is this court's decision, Wildman v. Frank, where this court reversed factual findings as to credibility. And there are other examples that we cited, such as Hire, the U.S. Supreme Court's opinion in U.S. Gypsum Company, the reasoning in Sing Fuels that follows Hire. I mean, there's a whole line of cases. And here the district court repeatedly ignored substantial evidence. And with respect to Care America, it was remodeled. Lading admitted it was remodeled and opened as a new pharmacy called Care America. I'm sorry, I misspoke. Old Emerton, what had been the Old Emerton location, closed in January 2012. Everything was moved to Plumtree. It was taken off the premises. And then it was remodeled for 11 months into a new closed-door specialty pharmacy. Totally different kind of pharmacy. As Lading testified, it's fundamentally different. It opened in December 2012. And at that point, you know, the opinion says, oh, it's the same physical location. Well, that analysis doesn't work. That's illogical and implausible, which is another basis for reversal. Because everything was removed. And Care America had its own separate computer system, as Lading testified. May I ask you a question about malice? Yes. I think that there's no dispute about this, but tell me if I'm wrong, that your client can prevail only if you can show not only the absence of probable cause and reliability, but also malice, that that's a separate element. And the district court did make a specific finding, and here it was based largely on credibility assessments, that whether or not there was probable cause, there was no malice here. So what would you have us do about that? So the district court ignored substantial evidence that Lading and Mosley fabricated evidence and misled the prosecutors. The district court found them credible, and it did it. It took care to note this based on their demeanor at the trial. So how do we get behind that? Well, Your Honor, the cases on the standard of review make clear that a district judge cannot insulate their findings from reversal by just mouthing the words credibility and then ignoring substantial evidence over and over that contradicts what happened. I mean, you asked for... On this, just on the cold record, I can say the district court was wrong in its credibility judgment. Those two people were lying, and your client was telling the truth. Your Honor, it's not a matter of credibility. It's a matter of ignoring the substantial evidence showing that Lading and Mosley... Good examples are Lading and Mosley admitted they knew that Pharmacare transferred significant amounts of inventory and failing to count those transfers spawned false shortages and losses. JA 588 to 590, JA 899 to 900, JA 923, JA 865 to 866, JA 882 to 883, JA 884 to 887. That's probably why the district court found them so credible because they were willing to own up to the things that went wrong. But that is a different question from whether there was malice. I don't think you're treating these things as two different elements. Respectfully, Your Honor, the district court did not take into account those admissions. They are absent from the opinion. The district court ignored the substantial evidence and all those JA sites I just read. That's nowhere in the opinion. And Lading, in fact, further admitted that she deliberately decided, even though it wasn't her job, even if there were serious errors in the numbers, it wasn't her role. So she was willfully blind. And that's malice. She's saying, I can just look the other way. I can bury my head in the sand. I don't think that is what malice is under Maryland law. Your Honor, there's different types of culpability that can establish malice. And one of them, as the Chestnut and McPherson cases we cited recognize, is misleading prosecutors and falsifying evidence. Or falsifying evidence. It can be the basis for malice, but the district court found here it wasn't. Well, the district court didn't have the benefit of a legally proper probable cause analysis. Had it done a legally proper probable cause analysis, then it would have had to look at malice in an entirely different lens. I see that, oh, I think I'm a little over time. You are. All right. Thank you, Mr. Greenberg. Thank you, Mr. Greenberg. Ms. Farm Harbor. Good morning. May it please the court. My name is Melissa Farber on behalf of the United States. The mountain of evidence supporting Mr. Annaparetti's search warrant affidavit and indictment leaves his malicious prosecution case at a total impasse. Following a three week long trial in which 19 witnesses testified and the district court reviewed scores of exhibits, the court issued a 67 page opinion including findings of fact, findings of credibility, and holding that Mr. Annaparetti completely failed to prove the two disputed elements of his malicious prosecution case, lack of probable cause, and presence of malice. Mr. Annaparetti cannot overcome that mountain of evidence on this appeal and his appeal must fail. Your honors, I would like to go through the two disputed elements of malicious prosecution that were at issue at the district court level and I'd like to start with the malice element which Judge Harris, you pointed out in your questioning of Mr. Greenberg. Because this was a truly remarkable malicious prosecution case in the sense that the plaintiff, Mr. Annaparetti, at trial presented no evidence of malice. And as Judge Harris pointed out, malice under Maryland law is a separate required element that a malicious prosecution plaintiff must prove to succeed, separate from any lack of probable cause. And there was just no evidence of that here. This court is going to review the district court's finding about malice for clear error which is just a plausibility analysis. And Maryland law is clear that malice requires something more than negligence. It requires a personal motivation, a wrongful motive beyond simply wanting to put someone you think committed a crime in jail. That's from Montgomery at 925. And here the district court relied on at least plausible evidence negating malice. The district court's opinion goes into detail about the efforts that Agents Lading and Mosley went to in order to be accurate, as accurate as possible in this affidavit, to conduct a thorough investigation. He made findings about how credible they were, how they were hard-working officers with decades of experience in public service. That's all at JA 2272-79. And one of the things the district court focused on were findings about Agents Lading and Mosley working in order to verify one slight discrepancy in the search warrant affidavit that came up right before the affidavit was meant to be sworn out regarding whether Mr. Annaparetti directly told Lisa Ridolfi not to conduct reversals or not. Someone realized there was a discrepancy with an interview memo, and instead of letting that stand, instead of taking the sentence out and doing nothing, Agent Lading orchestrated an effort to figure out exactly what happened that involved interviewing Lori Gutberlit, the investigator who wrote the memo, re-interviewing the witness who made the statement, and then we see emails from Agent Mosley at 9.40 p.m. summarizing what everybody found and what the accurate statement is to put in the affidavit. And the district court did not clearly err in finding that that evidence, along with credibility determinations, negates any finding of malice. Mr. Annaparetti's arguments to the contrary are unavailing. These arguments are based on an incorrect view of how probable cause or lack of probable cause relates to a malice finding. There is not a single case in Maryland that says that if there is a lack of probable cause, which there was not in this case, but if there is, there's no case that says that a finding of malice is then mandatory. It is always permissive. Always permissive. And that's because courts recognize that sometimes there might be a lack of probable cause because of negligence. And as we know from Montgomery, negligence is not malice. You need more. Montgomery at 9.13 and McPherson at 2.83 discuss how the inference of malice from lack of probable cause is always permissive. Can I ask just a question about that? I mean, here, it wouldn't just, would it just be negligence? In order to prevail on a Frank's analysis, the district court has to be assuming it wasn't just negligence. There was either knowing falsity or recklessness as to falsity, but still no malice. So what does a case like that look like? Yes, Your Honor. So that's exactly correct, that a finding of lack of probable cause in this case could look like intentionality or recklessness. And even in that case, malice is still considered separately and malice is still not a necessary inference. That's still something that is permissive. So as I was reading the cases and trying to figure out what that space looks like, it looks like the court is saying something like even deliberate falsity in an effort to apprehend somebody who you think committed a crime, we're not condoning it, shouldn't have done it, but that's different from malice, which requires some kind of personal animus or conflict of interest that you really don't think the person did it. Yes, yes, Your Honor. I think that's exactly right. Yes, I think that's a good way to summarize it. It's something beyond trying to bring an offender to justice, someone who you think is guilty to justice. And so that inference, even in the case of finding recklessness or intentionality, is still always permissive. And so we're still looking at clear error review on malice. And the district court based that decision on plausible evidence. So you're saying, counsel, that under Maryland law, short of a confession of animus, you can't prove malice? No, Your Honor. I wouldn't go that far. And I think we have... I wouldn't go that far. That's why I wanted to see how at least I'm out of it. So where is it there? I think a good example might be, Judge Gregory, your opinion with Judge Harris in the Humbert case. That was another malicious prosecution case that came out from Maryland. It was a reversal of Judge Quarles' decision. And there, the opinion doesn't really go into the malice finding. It mostly goes into the lack of probable cause. But there, a jury found malicious prosecution. So we know that there was a finding of malice there. In that case, as you both may recall, the officers there didn't include the fact that the only witness upon which all probable cause hinged recanted her identification of a rapist. And DNA evidence definitively excluded that man as the rapist. And the officers there had the DNA evidence that said it couldn't be this person. It could not be Mr. Humbert. And they didn't share that. They held that. So that's a situation short of officers saying, I hate this guy and I want him in jail, where this court found... The evidence was clearly there was not a pursuit of justice in that case. That's exactly right, Your Honor. And that is not what we have here. The only evidence that Mr. Annaparetti was able to present at trial of any kind of malice was the idea that these agents were trying to win an award, which the district court correctly found just is... It's too much of an inferential leap to say that career public servants would throw away their entire lives to win a piece of paper or a piece of plastic. I'm sure, Your Honors, when you go back to your chambers, the walls are covered in these types of awards. Nobody is throwing away a career over something like that. And the district court did not clearly err in finding that there was not evidence of malice here. And even if this court disagrees and finds there was reckless or intentional inclusions or omissions that negate probable cause, it's still a clear error review on malice, and we still have a plausible basis to find lack of malice here. And that is an independent and sufficient and mandatory reason to affirm the district court in this case. But, Your Honors, we don't have to stop there because we also... This court should also affirm the district court's holding on the presence of probable cause as well. As we know, probable cause just requires a fair probability that evidence is going to be found in a place. And the affidavit unchallenged, if we leave it unchallenged, well establishes that. Judge Flanagan, I know you have reviewed countless search warrant affidavits in your time. And when the Supreme Court talks about what we need to be careful of with a search warrant affidavit in Gates, they're talking about affidavits that are bare bones. That's where we really need to be cautious. This is a 66-paragraph affidavit that is well supported. So the affidavit unchallenged establishes probable cause for the individual locations. It establishes probable cause to believe a crime has been committed. So Mr. Annaparetti's path at trial was to challenge the veracity of the affidavit. And that's where we get into the Franks analysis. And as the court is aware, Franks has two components, intentionality and materiality, requiring deliberate and reckless disregard for intentionality and requiring material falsity for materiality. And Mr. Annaparetti's case failed on both prongs at trial and it reaches the same impasse here on appeal. So I'd like to start with intentionality. The court's findings about intentionality are findings of fact that are subject to clear error review. That's from Pulley at 377. And contrary to Mr. Annaparetti's arguments, in considering intentionality, the court is looking at what the officers subjectively knew at the time of the affidavit and the grand jury testimony. And in order to evaluate what these officers subjectively knew, the court does go beyond the four corners of the affidavit. That is from Lull at 115, Pulley at 376 to 377, and from Judge Harris and Judge Gregory's opinion in Humber at 559. There, Your Honors, you found that the probable cause was not present in the affidavit and then you conduct a separate analysis looking outside the affidavit to see if there was other information that the officers knew that might support a probable cause finding. So it is just not accurate to say that you are limited to the four corners of the affidavit or that Judge Anderson committed a legal error when he looked at the investigation as a whole. The court also recognizes that an affidavit can't include everything. It's impossible to include everything that Agent Lading knew as a result of the investigation. And the trial judge, as this court has held, is in the best position to evaluate an officer's honesty about what they knew or didn't know. That is from Pulley at 377. And importantly, an affidavit is not false just because not every fact is correct. The Supreme Court recognized in Franks at 165 that sometimes these affidavits are put together hastily. They're not always perfect. Not every fact is going to be completely accurate and that is okay. Here, at least plausible evidence supported the District Court's finding that Lading and Mosley did not intentionally or recklessly include false information or omit materially exculpatory information in the affidavit or the grand jury testimony. Now, unless the court has specific concerns about Rodolfi and Tarkovsky and the 14-day rule, I'd like to set those aside and rely on the arguments in our brief. I think the facts are a little bit more clear about those issues and I'd like to focus the falsity discussion on Medic. So are there any concerns that the court would like me to address about Tarkovsky, Rodolfi, or the 14-day rule? Okay. I will move on to the Medic analysis then, which is pretty factually dense. And looking through the arguments on both sides here, my mind went to the clear error standard of review, which applies to the court's finding about the falsity of Medic. And how we know from the clear error standard that courts of appeals are not meant to have to duplicate the effort of the district court in trying to understand this Medic analysis. The district court had the benefit of hearing from numerous witnesses over days of trial testimony, looking at exhibits that were highlighted to draw his attention to the relevant information. Plaintiff asks you to completely reduplicate that effort in order to reverse a finding of fact on the falsity of Medic. And in this case, the district court's finding that Medic was not false is based on at least plausible evidence. So we know from the affidavit that the affidavit identified Medic as a preliminary analysis. It talked about these numbers as being approximate. It explicitly says there's data sets that are missing. So we know that this was just the analysis at this point in time that was a work in progress and the affidavit said that. The affidavit accurately reported the numbers they received from Medic. And the errors that plaintiff identifies in Medic, the errors Mr. Annaparetti identifies, focus on AIDS drugs only. So the primary evidence that the district court heard that there was anything wrong with Medic related to the expert Mr. Jed Smith's testimony about only AIDS drugs. AIDS drugs were certainly a part of the investigation, but the Medic analysis included many other drugs aside from AIDS drugs. And even among the AIDS drugs, Mr. Smith only looked at seven of the AIDS drugs because the eighth one, if he had looked at it, would show a shortage. So he stopped at seven. It is undisputed in this case that Mr. Annaparetti didn't present any evidence of what the actual shortage or surplus is. And when you look at Jeremy Dykes' spreadsheet, so Mr. Annaparetti talks a lot about how the analysis should have accounted for transfers between stores. It shouldn't have. That is Mr. Annaparetti's innocent explanation for these numbers and the court does not have to consider innocent explanations. An affiant does not have to address innocent explanations in an affidavit. That's from Bossack at 325, citing the Supreme Court case Westby, 583 U.S., 48 at 61. You do not need to address innocent explanations like transfers, like substitutions of certain drugs for other drugs. But setting that aside, Jeremy Dykes' spreadsheet accounts for transfers line by line, drug dosage by drug dosage, and finds shortages in 14 drugs, only three of which are AIDS drugs. So we know there were shortages in this case that went beyond the plaintiff's analysis. And it is not true, as Mr. Annaparetti argues in his brief, that Medic would have thrown out whole data sets if there was any risk of duplication. We can see that in JA 3320 at Lori Gillen's testimony. Importantly, though, Lading and Mosley had no intentionality if Medic was false. Mosley, as everybody testified in this case, was a transparent pass-through. He was enforcing subpoenas, getting data sets, and giving them to Medic. That's it. He wasn't doing anything else. He wasn't even deciding which data sets to get. He is not a person who is going to be able to mislead data experts who are analyzing data. And if you look at JA 3323, that's Lori Gillen's testimony. She's one of the Medic analysts. She says, I know that when requesters are giving me data, they're not experts in that data set. I don't... I'm sorry. I didn't mean to cut you off. Can I just ask you a question? Just hypothetically, I totally understand what you're saying. Hypothetically, just imagine the data sets are coming from some federal officials, and they're just like 100% wrong. They're wrong, wrong, wrong. They're on purpose wrong. And they pass through this person who, I understand, in the district court found this, as a matter of fact, is in no position to sort of get into the data. He's just a transparent pass-through. If it had happened that way, can the plaintiffs sue the people who produced... Like, who's he supposed to sue then? That's a good question, Your Honor. I don't know the answer to that. I don't know the answer to that. I know that in this case, there was actually a situation where Medic was looking at a data set from D.C. Medicaid and trying to figure out, is there any way we can use this? They had conversations with D.C. Medicaid, not with Agent Mosley, with D.C. Medicaid, to try to figure out, can we fix this data so that we can use it? And they decided they couldn't use it. They left it out. That's at JA-3273, Melissa Raposa's testimony. So Agent Mosley is seeing Medic doing this work, looking for the integrity of the data as Mosley thought they would. So that's all there in the record. And then there's just no evidence that Agent Lading had any belief in the falsity of any of the information that went into the affidavit. It's not unusual in an investigation for people to divide up areas of responsibility, and that's what happened here. Counsel, I do want to ask you this question about the 14-day reversal requirement. Now, that was an affidavit that was required, but that's not true. The 60 days, on what basis would the judge say, they said 14 is really 60, but 14 is okay here? Can you give me the basis for the district court making that determination? Yes, Your Honor. I disagree that it's not true that the 14-day rule is a requirement. It is a requirement. It's not a law. It's not a regulation. Then how is it required that it was not a law? It's required by industry standard. So witness after witness, including Mr. An— Does he have an expert to say that? No. An expert to say that it's industry standard? Yes. I can't remember what Mr. Fassett testified to, Your Honor, but Anna Peretti himself said it's industry standard and required to reverse prescriptions after 14 days. That is his own testimony at JA 1899. So Anna Peretti said it's required you have to reverse after 14 days. And what the affidavit— So who introduces 60 days? The 60 days is the actual law. Oh, the actual law. That's the actual law. And Matt, I see I'm running out of time, but— Well, you're okay. I'm asking the question right now. Yes, sir. So, but it's the law, right? 60— Aren't we adjudicating these cases, particularly criminal cases, by the law? Yes, Your Honor. 60 days is the law, and that's where we get to the district court's finding about materiality of the 14-day rule because the district court found that there was evidence both in the investigation and explicitly in the affidavit pointing to prescriptions that were not reversed for months well after the 60 days. So we don't believe that the language in the affidavit saying that 14 days is a requirement is false because it is, that it was required by industry standard. But even if you don't go that far, even if you don't agree with me, it is not material based on the fact that the affidavit included accounts of prescriptions that were not reversed for months or years. So we don't need the 14-day rule because we have prescriptions that were indisputably not reversed well past the 60 days required by law. And that, again, goes to the materiality component. As Judge Harris pointed out, medic, not material, amount of loss not required here, especially when you have so much other corroboration of criminal intent. The district court's holding that any shortage would establish probable cause, that's not correct. That's Mr. Annaparetti's statement. What the district court actually found is that a shortage is supportive of probable cause combined with the other evidence in the investigation. Wasn't the affidavit admitted because it was material? I'm sorry? Wasn't it admitted because it was material? Wasn't the affidavit admitted? Yeah, it was admitted as evidence, correct? Yes, the affidavit was admitted. And one of the elements of that, it has to be material, correct? Or is it just admissible? Yeah, I think it was admissible. It's material to the malicious prosecution case, certainly.   But you said, but the court said, no, it's fine because, and you're saying it's because he testified himself that 14-day was a reversal requirement. Not the law, which is 60. Right, and I think the point I'm trying to make is that the 14-day rule itself, which really is just mentioned in one part of the affidavit, is not material to a determination of probable cause overall because there is evidence in the affidavit and in the investigation that shows prescriptions that Mr. Annapuredi did not reverse well after the 60 days actually required by law. So even if you take every reference to the 14-day rule out of the affidavit, which is the test for materiality, you are still left with descriptions of prescriptions that were billed that were not reversed well after 60 days. So is it logical extent of your argument, this is hypothetical or counterfactual I suppose in some sense, that if you had someone clearly had animus, that 65, 75% of the evidence at trial was based on the animus, but the other 35% was okay? You would say it was not material because if you remove all the animus evidence that came in, some 65%, the 35% is enough to have convicted them? Then there would be no malicious prosecution? I'm not sure that I understand. I'm not sure I fully understand the hypothetical, but I don't think that's what I'm saying. In other words, you say, well, no, that's not material because there's other things there. I think you started, your first word was, I remember, that was a mountain of evidence. So the mountain, you said, that's enough, even if there was animus. That's a hypothetical. Yes. Because you don't concede any animus at all. No, not at all, Your Honor. But you're saying that if there was animus, as long as there's enough, it's the old saying, if you throw enough mud on a wall, some of it is going to stick. Well, I have two answers to that question, Your Honor. The first is based on this court's precedent in Allen, 631 F3D at 164. This court explicitly found that even if an affiant made false statements on purpose in order to mislead a magistrate judge, as long as there is ample other evidence of a crime, then there's still probable cause, even in exactly that hypothetical that Your Honor has posed, where there is animus and purpose in trying to mislead, which is not what we have here. But that is what the court looked at in Allen and found you still look to see is there a mountain of other evidence. And then as far as materiality goes, and going back to, Judge Gregory, your question about the 14-day rule, that is where we get the materiality standard. So the materiality standard is if we take this out, has it negated probable cause? If we take out this piece of challenged information, do we no longer have probable cause, right? And here we are talking about one statement about reversals within 14 days. And when you look at the rest of the affidavit, we have examples of prescriptions that were not reversed well after 60 days. So we know those prescriptions were illegally not reversed. That's right there in the affidavit. And we have this mountain of other evidence of probable cause, of mens rea, to believe that Mr. Annaparetti committed this crime of healthcare fraud. And that is what the district court relied on. And this court should affirm the district court's decision. Thank you. Thank you, Your Honor. Mr. Greenberg, you have some time reserved. Government counsel emphasized how long the affidavit is, but they didn't read a single word from it. They're running away from that affidavit, which Judge Gregory correctly recognized is material. They're running away from that affidavit because it's filled with misrepresentations, as our briefs demonstrate. And unfortunately, the opinion ignores substantial evidence showing those points. It was mentioned earlier, I think twice, including by government counsel, that it was a 67-page opinion. Much of the opinion is reciting the procedural history, and much of it is repetitive and duplicative. Now, I want to address this statement by government counsel. It's not accurate to say that the analysis is limited to the affidavit. The district court wrote, J.A. 2299, in determining whether probable cause exists, a court should only consider the information actually presented to the magistrate judge during the warrant application process. It incited lull, and that was quoting Owens, ex-Royal Owens, which I mentioned earlier. That's, again, J.A. 2299, the opinion at 56. The judge, unfortunately, then the opinion then contradicts the very principle that the opinion recognizes and that this court's precedent mandate and that government counsel is trying to circumvent. It's not true, as government counsel said, and there's substantial evidence in this point. This is not a matter of just weighing or credibility. It's simply inaccurate. It ignores substantial evidence to say that the only errors in MEDIC involved AIDS drugs. The errors involving transfers involved many non-HIV drugs. It was also said that MEDIC would not have removed all of the MADAP claims, had they known of the risk of errors. There's substantial evidence to the contrary that was ignored by the district court. Page 50 of our brief talks about the testimony by Lori Cannata. Specifically, the quotes, I'm not going to read them in the interest of time, J.A. 3319, J.A. 3323. Those quotes defeat what government counsel said, and they're undisputed, and they're also consistent fully with Mr. Smith's testimony on the very same point. The discussion of malice, it doesn't have to be a personal animus. It doesn't have to be something other than not wanting to bring an offender to justice, and it's not accurate to say there's only evidence of some mythical award. There's substantial evidence that Mosley and Leading misled the prosecutors, and misled the Madison judge. Let's look at MADAP. To call Mosley the only black agent, a transparent pass-through, is simply not accurate. It ignores the reality of his role. On J.A. 1605, Jeremy Dykes testified that Mosley told Dykes and the prosecutors, meaning Wilkinson and Pascal, during the spring and summer of 2013, that MADAP compared claims data files to make sure there was no double-counting or duplication of drugs. J.A. 1605. That's not a transparent pass-through, and the district judge ignored that. Wilkinson testified at J.A. 1714. I never thought there was double-counting issues until we were told that after the trial. That's the first time I learned that there were double-counting issues. Why was it the first time? Because Mosley didn't tell her, and he knew. He knew 80-20. He knew by definition MADAP was a secondary payer. The opinion ignores all that. Could I move back for a moment just to look at the Franks' first prong and get a clearer understanding of your argument that Mosley and Lading had a high degree of awareness of the errors in the affidavit? Can you point to the record what shows that those two agents had that high degree of awareness, which is getting back to reckless disregard? And if I want to just get that understanding from you before we get into the devilish details? Sure. Well, first of all, Your Honor, under this Court's precedent, including Humbert, it's obvious reasons to doubt as a standard. It doesn't have to be a high degree of subjective awareness. And that obvious reasons to doubt is the test for recklessness. That applies here. I thought Humbert stands for the proposition that reckless disregard means acting with a high degree of awareness of a statement's probable falsity, or that the affiant must have entertained serious doubts as to the truth of his statements, or had obvious reasons to doubt the accuracy. That's what I get out of Humbert. Am I mistaken? I'm sorry. Exactly, Your Honor. The last part, or obvious reasons to doubt as an independently sufficient basis for recklessness. Your Honor is exactly right on that point. Now, the evidence that there are obvious reasons to doubt is how the numbers are so out of whack with what Tchaikovsky and Ralphie reported. It's also that Mosley drafted paragraph 15 of the affidavit where he cherry-picked the four drugs that still had the largest, quote, shortages in Dykes' analysis, and counted all transfers. That's not just a coincidence. It can't be. And Lading said it's not her job to look at, not her job to correct errors, serious errors of transfers. That's cited in our briefs. But does saying it's not my job to correct amount to a high degree of awareness? Well, again, Your Honor, I mean, it's, or obvious reasons to doubt from the language Your Honor accurately quoted from the opinion. So, you know, under that test, certainly, Lading was reckless. Also, Lading, knowing that, in fact, the Med 4 trackers were not secret, knowing that, you know, it made no sense to say that an automatic refill is necessarily billing and not filling. And by the way, the government didn't respond to her argument that it was legal, under the laws of all the applicable jurisdictions, to do automatic refills as authorized by a prescriber without a patient's request or consent. That issue is waived. It's undisputed. The affidavit misrepresents automatic refills as nefarious. That is another major misrepresentation, especially when viewed in conjunction with the Kavskis and Rodolfi's reports that automatic refills for Med 4 is at the heart of the alleged scheme. That's what this scheme is supposedly about, this purported scheme. More malice. Care America. It's malice that Lading knew they had to, to have probable cause, they had to interview patients and establish from the patients that there was billing fraud involving Med 4s at Care America and they didn't interview a single patient. That's malice. You keep saying that's malice. In your view, under Maryland law, if there's deliberate falsity in a warrant application, you must find malice. You know, Maryland case law is kind of equivocal on that point. There are some cases that there's a presumption of malice. There are others that say it's permissive inference. Certainly Chestnut, which I want to... I guess I'm saying those might be somewhat different, but they would both suggest that it is not required, unless there are cases saying it's an irrebuttable presumption, and I don't think there are. Correct, Your Honor. It's not irrebuttable. That is true. You keep saying that if there was deliberate falsity in getting this warrant, that's malice. Under what law? Not Maryland law? Well, yes. I mean, that's evidence that would support a finding of malice. Yes, but then the district court said, even if I found that there was a Frank's violation here, deliberate falsity as to material information, I'm still not finding malice based on the testimony I heard and my credibility judgments. And for what it's worth, the fact that your client's best argument to the contrary was that they were doing this to win an award. So I just... I mean, if you can tell me, I guess quickly, I'm sorry I'm taking you over time, on what basis this panel might go behind that finding that would be helpful. Well, I want to go back to Your Honor's point about, you said credibility. As we explained in our brief, the U.S. Supreme Court recognized in Anderson v. Bessemer City, 470 U.S. at 575, quoted by this court in Jimenez, among other opinions, a district court may not insulate its findings from review by casting them as being grounded in credibility determinations. Here, the opinion ignores the substantial evidence that Lading and Mosley misled the prosecutors, fabricated evidence, and yes, it's true, Your Honor, it's true, Judge Harris, that that wouldn't necessarily require a finding of malice, but the district judge didn't even consider it. Ignore the substantial evidence in those points. So at a very bare minimum, this court has to... That's called reasoning in the alternative. I know you have objections to the way the district court wrote its opinion, but it is entirely permissible for a district court to say, look, I don't think there was a crimes violation, but even if there was, I'm not finding malice. Respectfully, Your Honor, it's legal error to reach that conclusion, and at a minimum, it's clear error, because the district court ignored the substantial evidence that there was a Franks violation, ignored the substantial evidence of malice, and didn't do a proper legal analysis under Maryland law because the district court ignored that substantial evidence. There was... I mean, I would just point this court to the chestnut opinion that we cite in our papers, page nine, allegations of a knowing falsification of evidence resulting in an absence of probable cause can also constitute actual malice, and actual malice is even more demanding standard under Maryland law. And then that goes on to cite DePino, Supreme Court of Maryland opinion, Butler, a district of Maryland opinion, saying because the jury could find a lack of probable cause, it could also inform malice. So the erroneous, legally erroneous analysis of probable cause and ignoring substantial evidence of malice, that infects and taints the whole, the alternative conclusion by the opinion. It didn't apply to the correct law because it ignored the substantial evidence and made those legal errors by looking outside the affidavit, by concluding that any shortage supports probable cause. And that any shortage conclusion is a standalone reason to vacate the opinion. If that was allowed to stand, the consequences for healthcare providers and other professionals in this circuit and beyond would be disastrous. I see that I'm over my time. I think I've covered everything I wanted to, unless your honors have more questions. Thank you, Mr. Greenberg and Ms. Farber, for your arguments. We'll come down and read counsel and proceed to our next case.
judges: Roger L. Gregory, Pamela A. Harris, Louise W. Flanagan